## Case No. 9,164.

### MARTIN v. SMITH et al.

[1 Dill. 85; [1] 9 Am. Law Reg. (N. S.) 694; 3 Am. Law T. Rep. U. S. Cts. 199; 4 N. B. R. 274 (Quarto, 83).]

Circuit Court, D. Missouri.    Dec., 1870.

PRACTICE IN EQUITY—FRAUD—DISCOVERY—LIMITATION OF ACTIONS.

1. Unless congress has otherwise provided, state statutes of limitation are applied to controversies in the courts of the United States.

2. The fraud which in equity will prevent the running of the statute of limitations, is that which is secret or concealed, as distinguished from that which is open, visible or known, and a secret or concealed fraud is in equity a fraudulent concealment of the cause of action.

[Cited in Re Rainsford, Case No. 11,537; Re Dole, Id. 3,965; Wood v. Carpenter, 101 U. S. 141.]

3. Even in cases of fraud, the statute will in equity begin to run as against the plaintiff when he has knowledge or information of facts which reasonably creates the belief that the transfer is fraudulent, and can be proved to be so; and if, under all the circumstances, the plaintiff has been guilty of negligence in discovering or attacking the fraud, the statute will begin to operate against him from the period his laches commenced.

[Cited in Baldwin v. Raplee, Case No. 801; Re Dole, Id. 3,965; Davis v. Anderson, Id. 3,623; Phelan v. O'Brien, 13 Fed. 659.]

[Cited in brief in Rogers v. Brown, 61 Mo. 189. Cited in O'Dell v. Burnham, 61 Wis. 571, 572, 21 N. W. 639, 640.] ·

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

4. What, in the view of a court of equity, will be regarded as a discovery of the fraud, considered.

[Cited in O'Brien Co. v. Brown, Case No. 10,-399; Leavenworth Co. v. Chicago, R. I. & P. Ry. Co., 18 Fed. 212.]

[Cited in O'Dell v. Burnham, 61 Wis. 571, 21 N. W. 639.]

5. The statute of Missouri, which provides that "actions for relief on the ground of fraud, must be brought within five years after the cause of action accrued, but the cause of action shall be deemed not to have accrued until the discovery by the aggrieved party at any time within ten years, of the facts constituting the fraud," construed and considered as in substance enacting the equity rule on the same subject, and fixing the period of limitation.

[Cited in Andrews v. Dole, Case No. 373.]

6. In an action by an assignee in bankruptcy of a fraudulent debtor, where the fraud was continuous, and the debtor remained down to the time suit was brought, the real owner of the property sought to be recovered, and in possession of it: *held*, that the statute did not bar the suit, even though the initial fraudulent transaction took place more than five years before the suit was commenced.

[Cited in Re Rainsford, Case No. 11,537.]

This was a bill in equity filed originally in the district court by Martin, as assignee in bankruptcy of Edward K. Woodward, to recover certain property from the defendants. Prior to February, 1861, Woodward had been a merchant in St. Louis, doing business in his own name and in the usual way. In the fall of 1860, however, he became much embarrassed, and, in fact, insolvent. He endeavored, late in 1860, first through the defendant, Gray, and subsequently through the defendant, Smith, to effect a compromise with his eastern creditors, but could not succeed. The defendant, Smith, is a brother-in law of Woodward, is by profession an attorney at law, and resides in Hartford, Connecticut. On the 8th of December, 1860, Woodward, at St. Louis, wrote to Smith, at Hartford, informing him that suits were already begun against him, entreating him to go to New York and Philadelphia to see if he could not effect the desired compromise and extension. Woodward's letter then continues: "Make the best arrangement possible, except cash down or security; if you cannot arrange with them, come right on here and buy me out on terms that you will be safe in, and such as they will be forced to accept. One suit is within the justice's jurisdiction, and judgment will be rendered on the 10th, so I want something done previous to that time. The trial of the other two is set for the 17th. I shall call for a witness who, I don't believe, will be got at the time, and the probability is that they will be continued for the present. My real estate is in a precarious condition, and unless you can get those creditors into the arrangement, so as to give me time to protect it, everything will be swallowed up, unless you can come out, etc. * * I shall be anxious to hear from you." Smith failed to make any compromise, but he effected a purchase of certain claims against Woodward,

at twenty-five cents on the dollar; went to St. Louis February, 1861, and on the 5th of that month purchased of Woodward his stock of merchandise, for the expressed consideration of $11,360. This sum was paid by turning over to Woodward, at their face value, the claims which Smith had purchased a few days before at one-fourth that sum; by assuming amounts due for the rent of the store building, and by his three notes to Woodward for $919.64 each. These notes were soon afterwards paid to Woodward in claims which Smith purchased of Woodward's creditors at twenty-five cents on the dollar, and then sent to St. Louis and turned over to Woodward at their par or nominal value, and the notes for rent were paid out of proceeds of goods sold from the store. After the sale of the goods to Smith, the store was operated in the name of Bailey, agent, for over a year; then in the name of Bell, agent, until March, 1864, when a limited partnership was formed under the statute of Missouri, the articles being executed by the defendants, Gray and Smith, the former being the general, and the latter the special, partner. This limited partnership was, by its terms, to continue for three years from March 1, 1864, and the business was to be conducted in the name of Gray. When the three years expired the same arrangement was continued, and the store was being thus conducted in December, 1867, when Woodward was, on his own petition, adjudicated a bankrupt, and in July, 1868, when the present suit was commenced. On the 22d April, 1861, Woodward, without beforehand consulting Smith, made to him, subject to certain incumbrances, a deed of all his real estate, and this deed was placed on record in February, 1862. Among other parcels was the house in which Woodward then lived, and where he has ever since resided, without paying rent therefor, and the taxes on which have been paid by Woodward out of money from the store. Certain parcels were redeemed by Woodward's direction, from judicial sales, by money likewise taken from the store, and titles made in the name of Smith, of which he was subsequently advised. From the store also, and under Woodward's management, encumbrances have been paid off and the claims have been assigned to Smith, who holds them against the property. See Bobb v. Woodward [42 Mo. 482], supreme court Missouri, March term, 1870. Soon after the purchase of the goods, Smith returned to Connecticut, leaving the store in the nominal possession of one Bailey, as his agent, and taking with him of moneys in the store, the sum of $37, to pay his expenses. In the professed capacity of clerk for Smith, Woodward remained in the store from the time of his sale to Smith, in February, 1861, down to the time of the filing of the present bill, and the evidence showed that, in fact, he managed there as before, and that Bailey and Bell, and even Gray, acted under his direction.

The bill made Smith, Woodward, and Gray, defendants, and set out at great length all of the abovementioned facts, with many others, and charged a fraudulent combination throughout all these transactions between Smith and Woodward, to defraud the creditors of the latter; that the sale of the goods was colorable and fraudulent; that in reality Woodward was the real owner during all the time the business was conducted in the name of "Bailey, agent," and in the name of "Bell, agent," and in the name of Gray; that the real partner of Gray is Woodward, and not Smith; that Smith has been refunded out of the sales from the store, all moneys which he has expended in the purchase of claims against Woodward, or for advances to purchase goods. The bill also alleged that Woodward, in pursuance of the original fraudulent design, procured to be effected the limited partnership with Gray, who was to contribute $6,000 in cash against the stock, which was put at $12,000, and Gray was to be interested in one-third of the profits, and Woodward in two-thirds, but to carry out the fraud Smith's name was used in the articles, and not Woodward's. The bill stated that large profits had been made; that the stock increased in value; that Woodward, at the date of his bankruptcy, was entitled to a large sum from the firm; that Gray had withdrawn large sums and amounts, and was indebted to his copartner, Woodward, therefor; that defendants Smith and Gray had a large amount of property belonging to the firm, which they had sold since the bankruptcy of Woodward was declared. The bill also stated that the assignee, after his appointment in January, 1868, first discovered the frauds aforesaid; that claims to the amount of about $13,000 had been established against the estate of Woodward, by various creditors named, none of whom, it was averred, knew of the frauds complained of, until January 3, 1867. It was also averred that Smith & Gray denied that Woodward had any interest in the firm, and it was stated that the latter had falsely returned to the bankrupt court that he had no interest therein. The prayer of the bill was that an account be taken of all the said partnership dealings between the defendants; that what should be found due from Smith & Gray to the firm, be decreed to be paid to the complainant as assignee; that the respective rights of the defendants in the firm property, at the date of Woodward's bankruptcy, be determined; that a receiver be appointed to collect the debts and take charge of the property of the partnership; that the property be sold and converted into money, and for general relief.

The defendants severally answered, denying the frauds charged against them, and also denying that Woodward ever had any interest in the limited partnership mentioned. Smith, in his answer, specially pleaded the statute of limitations of the state of Missouri, alleging that the purchase of the goods, charged in the bill to be fraudulent, was made February 5, 1861, and that no suit to set aside said sale as fraudulent as to the creditors was brought by or for them within five years after the sale was made and possession taken, wherefore the creditors and the assignee are barred of such suit by the statute of November 22, 1855, referred to in the opinion of the court. Replications were filed; a large amount of testimony was taken, and on final hearing the bill was dismissed by the district court, whereupon the assignee appealed to this court.

Lee & Webster and Cline, Jameson, & Day, for assignee.

Whittlesey & Hamilton, for defendant.

Before DILLON, Circuit Judge, and KREKEL, District Judge.

DILLON, Circuit Judge. In the argument at the bar counsel differed, not indeed respecting the general nature of the bill, but upon the point whether in the relief sought it embraced the real estate conveyed by the bankrupt to the respondent, Smith, as well as the personal property or the interest in the co-partnership therein mentioned.

The point is important, for the limitation as to real actions is ten years, and as to personal actions five years. The present bill was exhibited more than five years, but within ten years, after the sale of the goods and the conveyance of the real property.

If the averments of the bill and the prayer for relief be carefully examined, it is plain, beyond controversy, that all that is alleged respecting the real estate is in the nature of inducement to show the character of the dealings between Woodward and Smith, and to make probable the gravamen of complaint.

It is extremely important that we shall obtain a correct notion of the real nature, scope, and purpose of the bill; for upon the view we take of this will depend, as we shall presently see, the question whether the statute of limitations bars the relief sought.

The bill is not one to set aside as fraudulent the sale of the specific stock of goods made in February, 1861, or to recover their value as property to which the creditors of the bankrupt are entitled. This sale is indeed set out in the bill, and is alleged therein to have been fraudulent, but it is set forth only as inducement, as the initial transaction of a fraudulent conspiracy and scheme which ended, not with the consummation of that particular sale, but which continued in existence and was flagrant down to the period when Woodward was adjudicated a bankrupt, and when this suit was commenced.

The plea of the statute sets out this sale made in February, 1861, and then alleges that the suit is barred by reason of the lapse of more than five years before it was commenced. The plea misconceives the nature and purpose of the bill, and proceeds,

upon the mistaken notion that it is brought simply to impeach the sale of the original stock of goods made more than seven years before.

The true view of the bill is, that it charges that the real parties in interest in the business of the limited partnership carried on in the name of the defendant Gray, are Woodward and Gray, and not Smith and Gray, as appears on the face of the written and recorded articles, and is given out by all three of them to the creditors and the world, and consequently that the interest of Woodward in this business and in the assets of the firm belongs to the assignee for the benefit of his creditors, and it is this interest which the assignee by the present suit is seeking to recover.

The suit is a personal, as distinguished from a real action, and hence the ordinary limitation period is five years, and not ten, from the time when the cause of action accrued. Bobb v. Woodward [supra], supreme court Missouri, March term, 1870.

In the case just cited the supreme court of Missouri decided, upon the proof before it, that the conveyance of the real estate by Woodward to Smith was fraudulent, and of the correctness of that judgment on this point there can be no question. That case had no relation to the personal property or partnership interests now in controversy, and there was no question as to when the fraud was discovered, and hence what is said in the opinion on these subjects by way of argument by the learned judge who delivered it, is not to be taken as points decided by the court.

Upon the proofs in the record now before us we consider the fraudulent conspiracy between Woodward and Smith, charged in the bill, to be so clear as not to admit of fair debate, and that so far from ending with the purchase of the goods in 1861, it continued down to the time this bill was brought. The evidence is voluminous, and it would require too much time without any resulting benefits, to enter upon a detailed or analytical statement and discussion of it.

Suffice it to say, that it firmly establishes that Woodward designed to place the property beyond the reach of his creditors; that Smith made a colorable purchase of the goods to enable the debtor to effect his purpose; that apparently he has received from the sale of the goods in the store all sums which he expended in buying claims against Smith or otherwise; that Woodward was all the time the real, while Smith was only the nominal, party in interest. That the purchase of the stock of goods by Smith was fraudulent is very faintly, if at all, denied by counsel. At all events, they have placed the stress of their defence upon the statute of limitations, and it was upon this ground, undoubtedly, that the bill was dismissed by the learned judge whose decree we are called upon to review.

The question involved is alike interesting and important. To determine it, we must first look at the statute to ascertain its meaning and purpose, and then at the special character of the case in hand, and see whether it is one where the statute will operate to bar the relief sought. In a suit of this kind the assignee is clothed with all the rights of creditors (whom, indeed, he represents) to impeach transfers of property made by their debtor or colorably held by others in fraud of their rights. Allen v. Massey [Case No. 231].

The Code of Missouri declares that "there shall be but one action in the state for the enforcement or protection of private rights, and the redress or prevention of private wrongs, which shall be denominated a civil action." 2 Wag. St. p. 991, § 1.

The statute of limitations (section 8) enacts that "civil actions other than those for the recovery of real property can only be commenced within the periods prescribed in the following sections, after the causes of action shall have accrued."

"Section 10, within five years; fifth, an action for relief on the ground of fraud—the cause of action in such case to be deemed not to have accrued until the discovery by the aggrieved party at any time within ten years of the facts constituting the fraud." 2 Wag. St. p. 918.

Unless congress has otherwise provided, state statutes of limitation are applied to controversies in the courts of the United States with the same effect as they would be if the controversy were pending in the courts of the state.

It is necessary, therefore, to construe the 10th section of the statute of limitation above quoted, in order to determine its effect upon the rights of the parties to present suit.

We have had called to our attention no decision of the highest court of the state construing this statute in respect to the precise questions which we are now to decide. The legitimate office of construction is to ascertain the legislative will or purpose; and to this end it is not only proper, but often necessary to look not simply at the language of the particular enactment under consideration, but also at the subject matter of it, in the light which the former law, or general principles shed upon it.

Formerly, in the state of Missouri, the forms of action and modes of procedure were as at common law, with a distinct equity jurisdiction. At that time the statutes of limitations were, in substance, the same as 21 Jac. I. c. 16, and professed to apply only to certain specified actions at law. Rev. St. 1845, pp. 373, 374.

Equity at this time applied, of course, these statutes according to the settled doctrines of that court.

The Code subsequently enacted provided, as we have seen, that there should be but "one

form of action"—"a civil action;" and the legislature made the statute of limitations apply to all civil actions; which statute would probably be held, in this state, as it has been in others under legislation of a similar character, to embrace equitable as well as legal causes of action so far as they fall within the terms of the act. That is, the limitations as to all actions therein mentioned and provided for apply equally to causes of action formerly cognizable either in equity or at law. Newman v. De Lorimer, 19 Iowa, 244; Johnson v. Hopkins, Id. 49; McNair v. Lott, 25 Mo. 182.

In this view it is easy to perceive why the legislature adopted the 10th section of the act concerning the limitation in cases of fraud. If the provision had been merely that "actions for relief on the ground of fraud should be commenced within five years after the cause of action accrued," it is extremely probable that the courts would have been obliged to have held that the statute would begin to run from the period when the fraud was consummated, and not as under the well-known equity rule, from the period when the fraud was or should have been discovered. To remove all doubt on the point, and to preserve the equity doctrine on the subject, the legislature added the words: "The cause of action in such case shall not be deemed to have accrued until the discovery by the aggrieved party * * * of the facts constituting fraud."

In my judgment, the legislature by this provision, in substance re-enacted the doctrine which had been established by courts of equity, as to the effect of fraud in preventing the running or operation of statutes of limitation.

If this be so, it becomes important to examine the nature and grounds of the equity doctrine, the better to understand the meaning of the statute.

Mr. Justice Story states the doctrine of equity thus: "If a party has perpetrated a fraud which has not been discovered until the statutable bar may apply to it at law, courts of equity will interfere to remove the bar out of the way of the injured party." Story, Eq. Jur. § 1521. "The question often arises in cases of fraud or mistake, * * under what circumstances and at what time the bar of the statute begins to run. * * In cases of fraud and mistake, it will begin to run," he says, "from the time of the discovery of such fraud or mistake, and not before." Id. § 1521a.

This distinguished jurist, on the circuit, in the supreme court, and in the preparation of his commentaries, had frequent occasion thoroughly to explore the subject, and his opinions upon it are entitled to great consideration, though it is to be regretted that he does not go more into detail. In his commentaries, he does not discuss the nature of the fraud which in equity will prevent the bar of the statute from running; nor what, in the

view of that court, will amount to a discovery of the fraud. An examination of these topics, as well as of the ground and reason of the rule itself, is essential to a thorough understanding of the subject, and is required by the circumstances of the cause now before us for determination.

As to the kind of fraud contemplated: Some judges have said that the fraud which will avoid the effect of the statute of limitations must be positive and actual fraud. But this is a point which we are not now required to notice, for in this case the fraud was actual and positive.

It seems to me quite clear, both from an examination of the authorities and the nature of the case, that the fraud which shall operate to displace the statute or prevent its application is secret or concealed fraud, a fraud unknown to be such to the party injured thereby. In a leading case on the subject Lord Redesdale said: "That as fraud is a secret thing, and may remain undiscovered for a length of time, during such time the statute of limitations shall not operate; because, until discovery, the title to avoid it does not completely arise, &c. Pending the concealment 'of the fraud, the statute ought not in conscience to run," &c. Hovenden v. Lord Annesley, 2 Schoales & L. 624.

That the fraud must be secret or concealed, not open, known, or visible, to prevent the bar of the statute from running, is distinctly asserted or assumed in many cases. Troup v. Smith, 20 Johns. 33, 47, 48, per Spencer, C. J.; Stearns v. Paige, 7 How. [48 U. S.] 819, 829; Carr v. Hilton [Cases Nos. 2,436, 2,437]; McLain v. Ferrell, 1 Swan. 48; Bucknor v. Calcote, 28 Miss. 432; Wilson v. Ivy, 32 Miss. 233; Cook v. Lindsey, 34 Miss. 451; Young v. Cook, 30 Miss. 320; Campbell v. Vining, 25 Ill. 525; Farnam v. Brooks, 9 Pick. 212; Phalen v. Clark, 19 Conn. 421; Moore v. Greene [Case No. 9,763], affirmed 19 How. [60 U. S.] 69, 72; Ang. Lim. c. 18; Sugd. Vend. 612, pl. 17.

It is declared, indeed, that no case can be found where the statute has been avoided, at law, or in equity, unless on the ground of fraudulent concealment on the defendant's part. Bishop v. Little, 3. Greenl. 405.

This subject was discussed by a truly great judge in the case of Carr v. Hilton, above mentioned, which was a suit in equity, by an assignee in bankruptcy, to recover of the defendant lands fraudulently conveyed to him by the bankrupt. The defendant relied on the statute of limitations contained in the bankrupt act of 1841. In holding that the cause of action did not accrue to the assignee till the fraud was discovered, Curtis J., says: "Statutes of limitation do not run in cases of fraud while it is secret. It is objected that the bill does not contain any averment that the cause of action was fraudulently concealed. But it does state a case of secret fraud, and it would be difficult to distinguish this from fraudulent concealment. A

secret, or what is the same thing, concealed fraud, is a fraudulent concealment of the cause of action." This I assent to as a perspicuous and accurate statement of the law on this point.

As to what amounts to a discovery within the meaning of the equity rule: This is regarded as so important that it must, with all necessary circumstances, be distinctly stated in the bill.

Grier, J., speaking of this point when delivering the opinion of the supreme court, says: "Especially must there be a distinct allegation as to the time when the fraud was discovered, and what the discovery is, so that the court may see whether, by the exercise of ordinary diligence, it might not have been before made." Carr v. Hilton; Fisher v. Boody [Case No. 4,814]; Moore v. Greene [supra]; s. c. 19 How. [60 U. S.] 69. And the bill, it has even been said, should negative laches in not making the discovery. Mayne v. Griswold, 3 Sandf. 463; Field v. Wilson, 6 B. Mon. 479.

The question recurs, however, what is discovery? I answer, notice of the fraud; or, in the language of the Missouri statute, of "the facts constituting the fraud." What is notice? In answering this, Judge Curtis, in Carr v. Hilton, quotes and approves the following doctrine laid down in Kennedy v. Green, 3 Mylne & K. 719, 721, 722: "It is a well established principle that whatever is notice enough to excite attention and put the party upon his guard, and call for inquiry, is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it."

The cases quite generally hold that the statute will run and fraud will not avoid it, if the plaintiff, under all the circumstances, has been guilty of negligence in discovering or attacking it. Smith v. Talbot, 18 Tex. 774; McDonald v. McGuire, 8 Tex. 361, 370; Campbell v. Vining, 25 Ill. 525; Ferris v. Henderson, 12 Pa. St. 49; Johnson v. Johnson, 5 Ala. (N. S.) 90; Bucknor v. Calcote, 28 Miss. 432; Edmonds' Ex'rs v. Goodwyn, 28 Ga. 38; Lott v. De Graffenreid, 10 Rich. Eq. 348; Farnam v. Brooks, 9 Pick. 212; Way v. Cutting, 20 N. H. 187; Stearns v. Paige, 7 How. [48 U. S.] 819, 829; Edwards v. Gibbs, 39 Miss. 166; Ang. Lim. § 183, and note, § 190; Nudd v. Hamblin, 8 Allen, 130, and cases cited.

It is easy, it seems to me, to press this principle too far, and I prefer the test or doctrine approved and applied by Judge Curtis, i. e., holding the plaintiff to know all that the information he is possessed of makes it his duty, as a reasonable man, ordinarily vigilant in protecting his own interests, to know or to learn.

The language of the statute is "discovery by the aggrieved party at any time within ten years, of the facts constituting the fraud." This is the same, in my opinion, as if it read discovery of the fraud. If a party knows the facts constituting the fraud, he knows the transaction to be fraudulent. It is not enough simply that he is aware of the fact of the transfer, but he must know "the facts" which make that transfer fraudulent.

In Godbold v. Lambert, 8 Rich. Eq. 155, 164, where an alleged fraudulent deed was placed on record, and it was contended that creditors were bound to know its character, the chancellor very sensibly observed, "registry of a deed is only implied notice of its contents, and not of any fraud that may be perpetrated in its execution." I cannot assent to the correctness of the remark in the case of Lott v. De Graffenreid, 10 Rich. Eq. 346, that the registry of a deed is sufficient notice to creditors, and the statute of limitations begins to run from that period, even though the deed be fraudulent.

There is one peculiarity of the Missouri statute which ought not to be passed without notice, and that is the clause which renders it necessary to make the discovery of the fraud within ten years. The language of the section was evidently copied from the New York Code, which is literally the same as the Missouri statute, except that in New York the words, "at any time within ten years" are omitted. How. N. Y. Code, § 91. The same words are omitted likewise from the Ohio Code, the Nebraska Code (St. 1857, p. 395), the Kansas Code (St. 1868, p. 633), the Minnesota Code (St. 1866, p. 451), and the Iowa Code (Revision 1860, § 2741). All these statutes enact that in actions for relief on the ground of fraud, "the cause of action shall not be deemed to accrue until the discovery of the fraud," or of the "facts constituting the fraud." Words limiting the time when the discovery shall be made are, so far as I have observed, peculiar to the legislation of Missouri.

Lord Erskine, in one case, declared that "No length of time can prevent the unkennelling of a fraud." Forrester, 66. Lord Northington said, with emphasis, in Alden v. Gregory, 2 Eden, 285, "Never, while I sit here, will delay purge a fraud." These expressions of decisive indignation against fraud are natural enough indeed, but if taken literally they lay down a doctrine which, if fully carried out, would be at war with the peace and repose of society, on which rests the wise policy of all limitation statutes. Hence the provision very generally adopted in the legislation of the states that the statute will begin to run from the period when the fraud is discovered, and hence, also, the additional provision of the Missouri statute, which seems to require the discovery to be made within ten years from the consummation of the fraud. The effect of this provision is, not to declare that the plaintiff cannot for a period of ten years be guilty of laches, or that he may for full ten years shut his eyes to facts which it would otherwise be his duty to notice and act upon, but its effect, rather, is to require him, at his peril, to make the discovery within the

prescribed period. I do not doubt that the provision is wise in conception, and will prove salutary in operation.

The reason or ground in this rule in equity is quite plain. Applying, as this rule does, only to cases of secret or concealed, as distinguished from known fraud, as before explained, I have no doubt that Lord Redesdale gives the true reason for its adoption by equity, viz: that it is against conscience for a party to avail himself of the statute when by his own fraud he has prevented the other party from knowing or asserting his rights within the period prescribed by the statutes of limitation. 2 Schoales & L. 634; Troup v. Smith, 20 Johns. 33, 47, 48.

This is entirely consistent with the exposition of the rationale of the doctrine by Baron Alderson in Brooksbank v. Smith, 2 Young & C. 58: "In cases of fraud, courts of equity hold that the statute runs from the discovery, because the laches of the plaintiff commences from that date, on his acquaintance with all the circumstances. In this courts of equity differ from courts of law, which are absolutely bound by the words of the statute." Imperial Gas, etc., Co. v. London Gas-Light Co., 26 Eng. Law & Eq. 425.

So in cases under the Missouri statute: the limitation begins to run as against the plaintiff when he has knowledge of facts which would have impressed a reasonable man with the belief that the transaction was fraudulent, for from that time his laches begins, if his debt is mature.

Judge Curtis, in the case before cited, speaking of the ground of the rule that fraud voids the statute, says: "In my judgment the most reasonable and sensible ground is that, substantially, the title to avoid it does not arise until the fraud is known." [Carr v. Hilton.] This is adopting the view of Lord Talbot, Cas. t. Talb. 63, and it has also the sanction of eminent judges.

The title to avoid the fraudulent transaction does ordinarily arise as soon as the fraud is perpetrated (26 Eng. Law & Eq. 425; J. J. Marsh. 445; 33 Miss. 233; 20 Johns. 33, supra; but substantially it does not, because the fraud is not known, and hence the fraudulent wrongdoer is estopped, while the aggrieved party is kept ignorant of his rights, from setting up against him the bar of the statute.

But this assumes that the creditor's debt is one which is due, so that he is in law enabled effectively, to assert his rights, and therefore properly chargeable with negligence if he fails, for the prescribed period, to do so.

There may be some question as to the scope of the language of the statute, "an action for relief on the ground of fraud;" but there is no doubt that a bill in equity by a creditor to set aside a fraudulent conveyance or transfer of property by his debtor, is such an action. The cases before cited will show that this point has never been disputed.

Having thus seen that the present suit is one which falls within the aforementioned tenth section of the limitation act; that the fraud contemplated by that act is fraud which is secret or concealed, as distinguished from that which is open and known; and having also seen what, in the view of a court of equity, is regarded as a discovery of the fraud, so that thenceforth the laches of the plaintiff and the running of the statute alike begin; that the ten years' limitation in the section is not to be construed as sanctioning negligence or the shutting of eyes to information of the fraud; and having also seen the reason, or policy and purpose of this legislation, we are now prepared to apply the statute as thus expounded, to the facts of the present cause. This, in view of the length of this opinion already, we must do briefly.

The facts constituting fraud in the transfer of property by a debtor, are, in some cases, concealed or secret, and in some visible or open. The fraud in the sale of the stock of goods to Smith, in February, 1861, in view of the relationship of the parties, of facts known to a great many creditors as to Woodward's condition, and Smith's knowledge of it, and the manner in which Woodward was still allowed to exercise control over the property, was such, in our judgment, that any creditor might, if ordinarily vigilant, have discovered it within five years from its sale.

If the present was a bill simply to have declared fraudulent the sale made in 1861, we should have to hold, taking all the circumstances together, that the fraud was not so concealed or secret but the creditors, using due diligence, might and should have discovered it, and if their debts were due, could and should have assailed it within the five years. Undoubtedly, it was this view of the case which was taken in the court below.

But, as we have before shown, such is not the case made by the bill, and such is not the relief sought. The question before the court is, whether, upon proofs, Woodward has any interest in the limited partnership carried on in the name of the respondent, Gray; whether Smith or Woodward is the party really owning the interest other than that owned by Gray.

Upon this subject we entertain a very decided conviction, and that is, that Smith has no real and substantial interest therein; has apparently no money invested in it beyond what he has received; that his pretence of ownership is purely sham, a device to keep at bay the creditors of Woodward; and that the latter, though held out simply to be a clerk, is the owner of the interest in the firm, other than that held by Gray. Since 1861, Woodward has, in effect, been managing the store the same as before, giving to it his time, attention, and skill; to these, and the profits which are their product, his creditors and not Smith, are best entitled.

Equity looks at substance and not form. It penetrates beyond externals to the substance of things; and it accounts as nothing, and delights to brush away barricades of writ-

ten articles and formal documents when satisfied that they have been devised to conceal or protect fraud.

The fraud in the case before us, as we view it, ended not with the purchase of the goods in 1861, but continued down to the time this bill was filed. The case is different from what it would be if the sale of the goods had been the only transaction, and Smith had taken exclusive possession of them and held or sold them as his own more than five years before his purchase was attacked by creditors of his vendor.

It is our opinion that the fraud, commenced in 1861, has been continued down to the time this suit was brought; that in equity, as respects creditors, the interest in the firm and its business is owned by Woodward and not by Smith; that the latter holds that interest, whatever it may be, in secret trust for the former, and hence the statute of limitations cannot avail to prevent that interest from being ascertained and subjected to claims of creditors of the bankrupt.

It is not necessary in this view to consider the point made that at all events the statute could not bar the relief sought, at least not entirely, because the debts of some of the creditors of Woodward did not fall due until 1867.

We now decide two points only: First, that Woodward has an interest in the property and assets of the firm business carried on in the name of Gray, which may be reached by the assignee in the present suit. Second, that the statute of limitation, pleaded by the respondent, Smith, is no bar to the relief sought.

The decree of the district court is reversed. Reversed.

NOTE. Discovery of fraud within meaning of statute of limitations: Affirmed, Wood v. Carpenter, 101 U. S. 141. Followed, Davis v. Anderson [Case No. 3,623]. Cited, Andrews v. Dole [Id. 373]; Baldwin v. Raplee [Id. 801]; O'Brien Co. v. Brown [Id. 10,399]; Darling v. Berry, 13 Fed. 659.

Property fraudulently conveyed vests in assignee in bankruptcy: Followed, In re Rainsford [Case No. 11,537].